Good morning, your honors. My name is John Fabian. I'm here on behalf of the appellant, Jonathan Scarborough. May it please the court and counsel, Mr. Scarborough is seeking a trial in the district court on his claim under the Minnesota Whistleblower Act. The case essentially involves a 16-year employee who was an exemplary performer for federated insurance and never was disciplined prior to his protected conduct, which occurred on July 7th, July 14th, and July 30th. The district court dismissed Mr. Scarborough's claim because the court determined that Mr. Scarborough had not engaged in protected conduct. That issue has now been resolved in Mr. Scarborough's favor based upon the Minnesota Supreme Court's decision in Friedlander v. Edward Life Sciences. It's clear that Mr. Scarborough's reports on each of those dates were in fact protected conduct. His reports were not knowingly false or in reckless disregard of the truth, and they implicated violations of law, whether they were actual, planned, or suspected. So the reasons the court should reverse the district court and remand this matter to trial on the whistleblower claim is because Mr. Scarborough can satisfy all the elements of this prima facie case, and he has evidence of retaliatory intent, and he can also demonstrate that the asserted reasons for his termination were pretexts for illegal retaliation. I already addressed the protected conduct issue. The second issue would be the adverse actions that were taken against Mr. Scarborough. There are three. The first was on April 4th. That was the warning letter. The second was on April 13th. That was the demotion. And the last was the termination on April 20th. All these adverse employment actions occurred in approximately six weeks after Mr. Scarborough first engaged in protected conduct. In terms of evidence of causal connection, as we know, based upon the case law in this circuit, causal connection can be satisfied by evidence of circumstances that justify an inference of retaliatory motive. Courts often look to, number one, did the decision-makers have knowledge of the protected conduct? In this particular case, the decision-makers did, in fact, have knowledge. Mr. Carr and Mr. Pennington had knowledge of all of Mr. Scarborough's reports. And we look at timing. Here, as I mentioned, all the adverse actions took place within six weeks, approximately six weeks of the first incident of protected conduct. But there's more evidence than just timing and knowledge of the decision-makers. If we take a look at the other evidence of causal connection and retaliatory animus, so after Mr. Scarborough has his discussion with Mr. Pennington on July 7th, Mr. Pennington immediately conducts a secret investigation of Mr. Scarborough's expenses. Mr. Pennington commenced that investigation approximately 45 minutes after he and Mr. Scarborough got off the phone as it related to Mr. Johnston's fraudulent expense submissions. Basically, what happened was Mr. Pennington found out that Johnston had inappropriately claimed expenses for these picture frames, or these photographs that he had framed, and said they were for office supplies or the expenses were for office supplies and lamination and ink. And during that discussion, Mr. Scarborough says to Mr. Pennington, it's just like Freddie, he likes everything fancy, just like those rooms that he obtains for purposes of having meetings, the rooms at Hush Blackwell. And then Pennington says, what do you mean he gets those rooms for free? That sounds like a knee-jerk reaction by Mr. Johnston's friend, Mr. Pennington, to defend Mr. Johnston against Mr. Scarborough's accusations of Freddie likes to live high in the hog. And then that's when Mr. Scarborough engages in the first instance of protected conic, and he says he's been submitting requests for reimbursement of those meeting room expenses on a regular basis. And then Scarborough says he was going to inquire as to whether, in fact, he was actually getting the meeting rooms for free. That gives rise, then, to the next report on July 14th, and he reported that information to Pennington. So the first piece of retaliatory animus was Pennington's investigation into Scarborough's expenses after the July 7th report. Now we have the July 14th report. Can I ask you some questions about the report? You raised the Freelander case early in your argument. Now, as I understand, the district court did not have the benefit of that opinion. So what is your view on how, if any, the district court erred without having the benefit of the Freelander case? So the district court did, in fact, have the amendment to the statute. It took place in 2013. District court chose to apply the case law that had developed around the definition of good faith as opposed to the plain language of the statute. The Freelander case was designed to ascertain whether that judicially created definition of good faith remained. And, of course, the Freelander court determined that those cases had essentially been annulled by virtue of the amendment to the statute. So the employee no longer has to act with the purpose of exposing the illegality. So is that error in and of itself that requires a reversal? Well, it would, Your Honor, primarily because the court only based its decision in terms of dismissing the summary judgment or dismissing the whistleblower claim on the basis that Scarborough didn't engage in protected conduct, that his reports were for the purpose of exposing the illegality or he exposed what Federated already knew. That wasn't a correct interpretation of the law. The law has been properly interpreted, and Freelander applies. And Judge Frank has since recognized in his district court slip opinion, I think it was Womback v. Minn Act, that, in fact, those amendments have done away with the employee having to blow the whistle for the purpose of exposing an illegality. I mean, he couldn't be any clearer in his slip opinion. So it is grounds to reverse the district court and remand the case for trial. Going back to the evidence of retaliatory animus, so when Scarborough had his conversation with Pennington on July 14th, Pennington essentially feigned ignorance of what Johnson had been doing and said to Scarborough he wasn't sure where Scarborough was going with this. Pennington knew at that point in time. He had been Johnson's regional marketing manager, and he had approved Johnson's fraudulent expense reimbursement requests going back to at least April of 2012. That's what the discovery shows in this case. And Pennington understood that given his complicity, this type of inquiry may in fact reveal what he had done, which essentially was allow Johnson to claim these expenses fraudulently. And so Pennington at that point did everything he could basically to set Jonathan Scarborough up for the discipline that he received. And again, this all emanates from Scarborough's report as to Johnson's fraudulent conduct. I hope I didn't mix up the names too badly there. So then we turn to Pennington's use of Johnson's July 21st, 2014 voicemail message. Johnson leaves Pennington a voicemail message and claims that Scarborough knew about the whole hush situation from the very beginning and that he convinced the other district marketing managers to do the same thing. Well, Pennington knew that that was false because Scarborough wasn't involved from the very beginning, Pennington was involved from the very beginning, and none of the other district marketing managers had submitted fraudulent expenses. Pennington knew that because he reviewed the reports that were generated for the time period from July 2012 to July 2014. Interestingly enough, those were parameters that Pennington himself had chosen because he was mistaken as to when Scarborough actually took over his position. He limited the scope to try to avoid having information revealed that would demonstrate that he, in fact, had approved some of these fraudulent expenses. And the evidence, in fact, shows that Pennington actually participated in meetings where Johnson had arranged for the rooms. His calendar shows the dates of the meetings. His calendar reveals that he, in fact, was present in town for the meetings. And so this is a gentleman who went out of his way to retaliate against Mr. Scarborough after Scarborough brought Johnson's fraudulent scheme to light. Pennington sent a text message to Michael Carr that, this is July 24th, that Scarborough is lying through his teeth, I have verification. We didn't have verification. The supposed verification was Braxton Weaver, and all Braxton Weaver talked about was how he wanted to take... Braxton Weaver was another district marketing manager. He wanted to take his guys to a St. Louis Cardinals game, asked Scarborough about it. This was some time ago. Scarborough said, well, I'm not sure how to do that. You might want to get with Freddy. And that was the information that Braxton Weaver had, and from that they extrapolated that Scarborough supposedly told Braxton Weaver that he was supposed to falsify and dummy up invoices so he could request reimbursement for expenses that were never incurred. That just never happened. It was all part of the setup. Let me ask you about what you characterized. I think it was the third report, the July 30, 2014 report about Johnson's conduct being illegal and also discussed the possibility that there might have been some withholding tax difficulty. How does that fit in the framework, the statutory framework, as a report that's actionable? Well, so the July 30 discussion was this breakfast meeting, and so Scarborough talked to both Pennington and Kerr and basically reemphasized that what Johnson had been doing was illegal. He was dummying up invoices. He was actually fabricating invoices from Hush Blackwell and submitting those as part of his out-of-pocket expense reimbursement claims. And so Scarborough brought that up during the meeting, and then he talked about, in essence, the potential tax implications, the one tax implication to Johnston because he was receiving money. But that doesn't implicate the employer. Oh, yeah. No, Your Honor. And then there was also one other comment he made, though, and it had to do with Federated. Because this was income, because it wasn't proper expense reimbursement, Federated wasn't withholding taxes with respect to the money it was paying Johnston for these fraudulent invoices. So that was the issue that he raised. So that's a legitimate issue for the employer to consider. The point here is that Scarborough was trying to, I think. I don't understand how the employer can withhold money that was stolen from it. No. What Scarborough was saying was that the fact that it came to light that Johnston had stolen over almost $4,000 plus and he'd received those payments directly from Federated for his expenses, that money wasn't money that was actually reimbursement of an out-of-pocket expense. It was money that Federated gave him, and since they gave him that money, it was income, and there should have been withholding. That's Scarborough's point. That's what he said. I can't change those facts. I mean, that was the report. The report still falls within the parameters of the Whistleblower Act. It's a suspected violation of law having to do with the tax code. Okay, well. In any event, following the July 30th report, Scarborough then was subjected to a whole line of interrogation, and from there, there was the August 4th warning letter, there was the demotion, then there was the termination. I'm going to reserve 30 seconds of my time. Thank you. Mr. Stenmore? Good morning, Your Honors. Good morning. You may proceed. It pleases the court, counsel, and I'd like to acknowledge at council table my partner, Britt Gilbertson. Your Honors, while we still contend that Scarborough did not engage in protected activity and his conduct did not constitute a report even under Friedlander, this court need not even address that issue. You don't have to decide whether Judge Frank should have thought about Friedlander or whether he was right or is he wrong is because his intervening misconduct, which we submit is undisputed in this case, decides this case. And so you don't even have to think about Friedlander. And there's three reasons why you don't. His intervening misconduct, this court's decision in the Mervine case, which Judge Wolman just issued last week, and the judicial admissions that Scarborough made in the Missouri case. Those are the three reasons why you should affirm summary judgment. Counsel talks about Mike Pennington repeatedly in their briefs and in their comments, but it's important to remember that it was Mike Kerr and Mike Kerr alone who decided to terminate Scarborough's employment upon learning that he had called manager Christopher Terry and told him based on some rumor he heard at a state fair or county fair that he was going to get fired. Let me interrupt. Whatever happened to that? What happened to Pennington? He's still employed by the company. And Johnson? Freddie Johnson is not employed. Okay. Very well, thank you. So here's the intervening misconduct. And as you know, timing doesn't satisfy the standard under this court's rulings. And there's no evidence other than that Mike Kerr was the ultimate decision maker in this case, and there's no evidence that he had it out for Mr. Scarborough, and he had no motive to protect Freddie Johnson. And this court has repeatedly ruled that intervening misconduct undermines any causal inference, so it's important to look at what Mike Kerr knew and believed at the time. And it's important to note that it came from multiple sources. It came from Mike Pennington, it came from Freddie Johnson, it came from Braxton Weaver, it came from Christopher Terry, and it came from Scarborough himself. Freddie Johnson reported that Scarborough knew about the falsified expense report, that Scarborough was complicit, and he encouraged others to engage in the fraud. Braxton Weaver reported to Kerr that Scarborough knew about the fraudulent expense report and was also engaged in unethical conduct regarding Cruz credits. Then Scarborough was given a warning letter on August 4th making it clear that any other misconduct and you're going to be fired. It says, you need to understand Federated will not tolerate any future circumstances that call into question your integrity, violations of Federated policy, or acts of retaliation toward other employees no matter how minor. And then in a profound display of poor judgment, he calls up Freddie Johnson's marketing reps and falsely tells them that Johnson's going to get fired. And then they find that on his Disney expense reports that he has falsely submitted expenses containing personal items, expenses for his family, hotel, a golf shirt, on the company credit card, and he ultimately writes a check to Federated for that. And then he's demoted on August 13 for those reasons but others. And I think if you look at any exhibit in the materials, you should look at the appendix, pages 197 and 198. And these are the talking points that Mike Kerr had when he had the conversation with Mr. Scarborough around his demotion. And he talks about in the past. So he talks about in the past. You tried to take for your own use miles for a flight. As a DMM, you turned in expenses for family when covering an arms function. And as an RMM, you removed $25,000 in fixtures from a house Federated was buying out from you. And at that point, he says, I was willing to push reset. So there's a lot of stuff going on well before this to question Scarborough's integrity, his honesty, manipulating expense reports, taking things for himself. Let's see again. What did the district court's analysis of the intervening misconduct? Judge Frank didn't reach that issue because he found that there was not a report. So that issue was not addressed by the district court. In other words, you're asking us to rely upon a ground for affirmance. It was never addressed by the district. Correct. Correct. And you're authorized to do that. And on what theory that you're indisputably correct in your position. I'm sorry. Are you arguing that there's no question of fact for a jury as to anything that you've told us was actually the truth? Correct. Yeah. In terms of intervening conduct. When you look at the record, no reasonable jury could conclude that Mr. Scarborough should remain employed based on intervening conduct and Mr. Kerr's honest belief. But it wasn't raised before the district court. I'm sorry. Was this intervening conduct raised? It was. It was extensively briefed. Everything that you have before us was presented to the district court. And the district court didn't get to it because they thought there was nothing there. Correct. And thought that there was no. No report. So he didn't even get to the first stage. Under Freelander, we still contend under Freelander, there's no report. But I don't know that you have a leg to stand on. And that's why we're focusing on the causation issue because. You may not get the causation if we go back to Freelander. Well, no, you have. If you go to Freelander. That would be hashed out at the retrial or at the trial. That was never held. At the trial court, we could even assume for purposes of this argument that there was protected activity. And then the next step is, which is Mr. Scarborough's burden, is to establish that there was pretext for his conduct. Because we've raised legitimate non-discriminatory reasons on why he got fired. All of his intervening conduct. Did you raise any of that in his reply brief? I'm sorry, Your Honor? Did Mr. Fabian raise anything like that in the reply brief about. About causation, yes. And the explanations thereof and the fact that the jury could have found something else. Yeah, he challenges. He says, well, you know, there's questions of fact about the honest belief. There really isn't. Because when you look at the honest. Belief is one thing. It's the intervening misconduct that has never been addressed. Yeah. But the record is clear on what their intervening conduct is.  In your eyes, but maybe not in the eyes of the jury. Maybe they thought this was sort of a plot to get back. Because of the complaints about Pennington's collusion with Johnson. Who is no longer with the company. The undisputed facts are that Mike Kerr was the decision maker. Well, we don't know that he was objective about it. If he was relying upon the Penningtons of the world. Well, and here's the precipitating. Can we take anything that Pennington says as being the gospel truth. In view of his relationship with Johnson. Covering up the misconduct on Johnson's part. And that's why it's important that we talked about that. It came from multiple sources. It came from Freddie Johnson. It came from Braxton Weaver. And it came from Mr. Scarborough himself. Who recorded this conversation with Christopher Terry that precipitated his termination. There's no factual dispute about the conversation that Mr. Scarborough had with. Yeah.  There were angry outbursts as you look in his talking points. He talks about his angry outbursts. He talks about his conduct and demeanor. He talks about the cruise card gifts. He talks about booking flights. He talks about the reimbursement. So, a multitude of things that have nothing to do with Freddie Johnson. Have nothing to do with Mike Pennington. And the final precipitating event was Mr. Scarborough's call to Christopher Terry. Saying, you're about to get fired. Which was false. Which was malicious rumor gossiping. And Mr. Kerr hears about that. And calls up Mr. Scarborough first thing in the morning and says, you're fired. I'm done, dude. Do you, what is your position on Freelander? Do you think that the district court, would you agree it's not the analysis that it would have conducted had it had Freelander? It would have been a different look at that. We believe even under Freelander, these aren't reports. Because Freelander did not overrule the concept that if it's part of your job duties. Or if it's something that, a minor thing that happened in the past. But it went to the intent, right? The purpose for, discuss the purpose for reporting the alleged violation. And wouldn't, whether or not it was part of your duties in your job position, your employment position. Wouldn't that go to your purpose or your intent? I think you can parse it different from that. Because when you look at Freelander, what they were saying is, we are defining what good faith is. They didn't redefine what a report is. And we believe even under Freelander, what Mr. Scarborough did was not a report. Because it was part of his job duties. He was reporting something that related to some past act. And when you look at what he's reporting, he's basically reporting, he has a dispute with management over a personnel matter. You know, it's not the kind of thing where you typically have in a whistleblower case. Where it's, you know, I think you're cheating the government. Or you're discriminating against me because of my age. Or whatever it is. It's not that kind of report. So it's these kind of amorphous, kind of offhand comments that he makes. That they really don't fit within the report structure when you look at how that statute is constructed. But again, you don't need to get into that. Because we believe that the record here is so clear on the causation issue. Undisputed facts about Mike Kerr, the decision maker. That the court should affirm on that grounds. And Judge, your ruling in the Mervine case is very, very similar to this case. In that case, the plaintiff had denied the conduct. It involved somebody who said that they were complaining about their supervisor's proposal. That constituted illegal double billing. Over which the supervisor was reportedly very angry. Three weeks later, the plaintiff was fired. But the court found, and your honor found, that the plaintiff had displayed a lack of professionalism. Much like Mr. Scarborough did. Made statements that caused plant engineering employees to question their job security. Exactly what Mr. Scarborough did in this case. Discussed private employee information in the presence of others. Exactly what Mr. Scarborough did. And also threatened to retaliate against one of his accusers. Saying, I'm going to get that fill in the blank for complaining to HR. And we have conversations recorded in here. Where Mr. Scarborough is making those same kind of threatening comments about Mr. Pennington. Saying, I'm going to get this guy. I'm going to find a way to show him. And using all sorts of very foul language. Talking about Mr. Pennington. And in the Mervine case, the plaintiff denied all those allegations. Said, well, all this intervening misconduct stuff didn't happen. It was trivial. It really didn't matter. But this court found that any inference of any sort of causal relationship was undermined by these intervening events. And this court said, in determining whether a plaintiff has produced sufficient evidence of pretext. The key question is not whether the stated basis for termination actually occurred. But whether the defendant believed it occurred. And then went on to rule and affirm summary judgment. This case is virtually identical to the Mervine case. And then two, you have to look at the Missouri case that Mr. Scarborough filed. And that's from our appendix at 16. And allegations in a complaint are binding admissions. And if the court is wondering why Scarborough was warned, was demoted, or ultimately fired. You only have to look at the representations that were in his Missouri complaint. He says that the statements by Pennington, by Braxton Weaver, by Freddie Johnson. Caused Federated to lose confidence in him. Caused Federated to question his character. And were material in causing Federated to terminate plaintiff. And causing Federated to demote him and to fire him. So we believe that these admissions in his Missouri case are determinative in and of themselves. Because they answer the question. Why was he fired? Mr. Scarborough has said under oath. Not under oath, I'm sorry. It wasn't a verified complaint. He has made these allegations in this Missouri case. That his termination was caused by the comments by Mr. Pennington, Mr. Weaver, and Mr. Johnson. And I think that eliminates any question about why Mr. Scarborough was fired. Because he's admitted why he was fired. And it has nothing to do with his alleged protected activity. So we believe that intervening misconduct. Which is abundantly clear from this record. Which parallels very closely this court's decision in Mervine just last week. And based on Mr. Scarborough's admissions, judicial admissions in his Missouri lawsuit. Saying that his termination was caused by what he claims were defamatory statements by these other individuals. And understanding it was Mike Kerr who made the decision. Based on the comments that Mr. Scarborough made to Christopher Terry. Which have nothing to do with Pennington or anybody else. That's what caused his termination. And nothing to do with his alleged protected conduct. Unless there are other questions. Thank you for your argument. Thank you. How much time does Mr. Fabian have? Twenty-nine seconds. You may have two minutes, but not more. Thank you, Your Honor. Your Honor, when the facts are construed in Mr. Scarborough's favor, there's no intervening misconduct. And that's what the summary judgment standard requires. There was no prior knowledge of Johnson's fraudulent scheme. Scarborough did not tell Johnson's marketing representatives that Johnson was fired. He did nothing wrong in connection with the cruise referral program. And booking his own travel. Scarborough never admitted to inappropriate expenses because they weren't inappropriate. Scarborough paid Federated for the personal charges on his credit card. Which is the same as Mr. Carr or any other Federated employee should do. He didn't engage in angry outbursts. And then we have the conversation with Christopher Terry. It didn't quite go down the way counsel represented it. But this was a private conversation out of concern for a friend of his. Mr. Terry reached out to a mentor who then got in touch with Mr. Carr. And when Mr. Carr told Mr. Scarborough he was terminated, or not when he told him he was terminated, but when he testified, he said the conversation with Terry was a straw that broke the camel's back. Which, of course, then implies that all the other reasons that we've been looking at, including Scarborough's report, the fact that Scarborough continued to adamantly deny that he never knew about Johnston's fraudulent scheme, factors into the termination as well. This case is somewhat similar to the court's decision in Hudson v. Norris. And by that I mean, quoting from page 1051, it says a large number of adverse actions that occurred hard on the heels of protected activity in this case, particularly when juxtaposed with Mr. Hudson's previously strong employment record, is significant evidence that what happened here was more than just coincidence. Goes on to say, Mr. Hudson's demonstration of a causal connection is further strengthened by his proof that the reasons that the defendants gave for some of their adverse employment decisions were unfounded. That's exactly what we have here. There isn't the intervening misconduct that they claim that they rely upon for purposes of terminating Mr. Scarborough, because there are fact disputes with respect to each and every one of those. There was a phone call to Christopher Terry, trivial matter is what we contend, but according to Mr. Carr, it was a straw that broke the camel's back, so everything else was encompassed. That's why Mr. Scarborough gets to have a trial on his whistleblower claim. He's satisfied all the elements. He's demonstrated that there's pretext, and we would request the court grant Mr. Scarborough's request. Well, the case is submitted. We'll have to do as we often do. We'll separate the rhetoric from the reality and vice versa. I thank both sides for the argument. That completes our calendar for the morning.